[No. S063425. Aug. 3, 1998.]

FOSTER-GARDNER, INC., Plaintiff and Appellant, v.
NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH,
PA et al., Defendants and Respondents.

## COUNSEL

Latham & Watkins, Kristine L. Wilkes, Barry J. Shotts, Donna Jones, Diana L. Strauss, Jared G. Flinn, Robert P. Dahlquist and David L. Mulliken for Plaintiff and Appellant.

Anderson, Kill & Olick, Jordan S. Stanzler, Donald J. Baier, Demetriou, Del Guercio, Springer & Moyer, Gregory D. Trimarche, Kimberly E. Lewand, Wendy M. Conole, Spriggs & Hollingsworth, Marc S. Mayerson, Munger, Tolles & Olson, Cary B. Lerman, Cynthia L. Burch, Heller, Ehrman, White & McAuliffe, David B. Goodwin, Nossaman, Guthner, Knox & Elliott, Scott P. DeVries, Elaine M. O'Neil, Howrey & Simon, Robert H. Shulman, John E. Heintz and Mindy G. Davis as Amici Curiae on behalf of Plaintiff and Appellant.

Sinnott, Ditto, Moura & Puebla, Randolph P. Sinnot, Gail L. Orr, Kearney, Bistline & Cohoon, Bistline & Cohoon, Gregory D. Bistline, Paul Alvarez, Ted H. Luymes, Knapp, Peterson & Clarke, Kroll & Tract, Paul Woolls, Jo Ann Montoya, Charlston, Revich & Williams, Kirk C. Chamberlin, Stephanie H. Scherby, Christine L. Judas and Elizabeth A. Moussouros for Defendants and Respondents.

Kinsella, Boesch, Fujikawa & Towle, Michael D. Howald, Wiley, Rein & Fielding, Laura Foggan, Daniel E. Troy, Allison R. Hayward, Bien & Summers and Elliot L. Bien as Amici Curiae on behalf of Defendants and Respondents.

## OPINION

**BROWN, J.**—In this case we determine whether environmental agency activity prior to the filing of a complaint, in this case an order notifying the insured that it is a responsible party for pollution and requiring remediation, is a "suit" triggering the insurer's duty to defend under a comprehensive general liability insurance (CGL) policy. Two Courts of Appeal have ruled on the issue reaching opposite conclusions. We granted review in both cases, holding *Fireman's Fund Ins. Co.* v. *Superior Court* (1997) 65 Cal.App.4th

1205 [78 Cal.Rptr.2d 418]█ for resolution of the issue in this case. The Court of Appeal here concluded that the order constituted a "suit." We disagree, and therefore reverse its judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

Since 1959, plaintiff Foster-Gardner, Inc. (Foster-Gardner) has operated a wholesale pesticide and fertilizer business in Coachella, California (Site). In August 1992, Foster-Gardner received an "Imminent and Substantial Endangerment Order and Remedial Action Order" (Order) from the Department of Toxic Substances Control (DTSC) of the California Environmental Protection Agency. DTSC issued the Order pursuant to the Carpenter-Presley-Tanner Hazardous Substance Account Act (HSAA), California's "Superfund" law. (Health & Saf. Code,[1] § 25300 et seq.)

The Order stated the following: As a finding of fact Foster-Gardner was "the owner and operator of the Site, [was] a responsible party, and has incurred liability for cleaning up the Site." As a conclusion of law, Foster-Gardner was a "responsible party" or "liable person" within the meaning of sections 25319, 25323.5, subdivision (a), and 25385.1, subdivision (g).

In recounting the Site history, the Order stated that "[p]rior to the banning of . . . DDT in 1972, Foster-Gardner handled DDT at the Site." In addition, Foster-Gardner stored anhydrous ammonia in tanks at the Site. The Coachella Fire Department had responded to leaks in the tanks. In 1990, the Riverside County Superior Court ordered Foster-Gardner to cease storing anhydrous ammonia. Foster-Gardner continues to handle other chemical products at the Site.

In June 1988, the Riverside County Health Department (RCHD) sampled surface soil at the Site. That investigation revealed extensive contamination with toxaphene, DDT (dichloro-diphenyl-trichloro-ethane) and its products of degradation, DDD (dichloro-diphenyl-dichloro-ethane) and DDE (dichlorodiphenyldichloroethylene). RCHD required Foster-Gardner to conduct a site assessment. Consultants for Foster-Gardner performed a "Preliminary Assessment of DDT in Soil" in January 1990, and "Additional Assessment of DDT in Soil" in March 1990. These studies concluded that the Site was contaminated within and beyond the property boundaries.

Sometime between February and May 1990, Foster-Gardner installed an asphalt cap over high-traffic areas of the Site, and treated some Site areas

[1] All further statutory references are to the Health and Safety Code unless otherwise indicated.

with a dust suppressant. In March 1991, surface soil sampling conducted by consultants at the request of the City of Coachella revealed excessive concentrations of DDT, DDD, DDE, and toxaphene in the combined residential and industrial streets, and lots adjacent to the Site.

In an unrelated investigation of groundwater contamination at the Coachella City Yard from May to September 1989, consultants discovered excessive concentrations of 1, 2-dichloropropane, 1, 2-dichloroethane and ethylene dibromide in the shallow aquifer. A report prepared by consultants for the Colorado River Basin Regional Water Quality Control Board (RWQCB) stated that the source of these contaminants was in all likelihood the Site.

In May 1991, the RWQCB required Foster-Gardner to conduct a preliminary groundwater investigation by installing and sampling three monitoring wells at the Site. In September 1991, the RWQCB required Foster-Gardner to install four additional wells. On October 22, 1991, the RWQCB issued a Cleanup and Abatement Order requiring Foster-Gardner to clean up and abate the effect of the discharge of contaminants from the Site into the groundwater.

As a result of the Site investigations, groundwater, soil, and surface soil data indicated that the Site was a source of contamination for groundwater and surrounding surface soils, and a potential source of contamination for surface water and air. The DTSC determined that during the ownership and operation of the Site by Foster-Gardner, hazardous substances or wastes had been disposed of onto the Site ground, and "there has been a release or threatened release of hazardous substances or hazardous wastes from the Site." The DTSC further determined that actual and/or threatened release of hazardous substances or hazardous wastes at the Site presents an imminent and substantial endangerment to the public health or welfare, or to the environment.

Foster-Gardner was ordered to submit within 10 days of the effective date of the Order a written notice of its intent to comply with the Order's terms. It was ordered to report within 30 days on its compliance with the direction of the DTSC, the RWQCB and/or the RCHD with regard to interim measures, including but not limited to continued groundwater monitoring, complying with the RWQCB's cleanup and abatement order and any subsequent requirements of the RWQCB made pursuant to that order, complying with the RCHD's orders to contain runoff from the Site, and conducting sampling and analysis of off-site surface soils. Within 180 days, Foster-Gardner was ordered to prepare and submit a remedial investigation and feasibility study work plan (RI/FS Workplan) detailing all of the activities necessary to

complete the remedial investigation and feasibility study of the Site and any off-site areas where there was a release or threatened release of hazardous substances from the Site. In accordance with the schedule set forth in the RI/FS Workplan, Foster-Gardner was ordered to at some future time prepare a "Remedial Investigation Report and Feasibility Study Report." Once the feasibility study report was approved, Foster-Gardner was required to submit a draft remedial action plan (RAP). Following approval of the final RAP, Foster-Gardner was ordered to submit a remedial design and implementation plan (RDIP). Once the RDIP was approved, Foster-Gardner "shall implement the final RAP."

The Order provided, "Nothing in this Order" precludes the DTSC or other agency "from taking any action authorized by law to protect the public health or safety or the environment and recovering the cost thereof." Foster-Gardner was liable for any oversight costs and "any costs incurred by the DTSC in responding to a release or threatened release of hazardous substances." These costs would be recovered by a civil action. Moreover, "[n]othing in this Order shall constitute or be construed as a satisfaction or release from liability for any conditions or claims arising [as] a result of past, current or future operations" of Foster-Gardner. Finally, the Order stated, "You may be liable for penalties of up to $25,000 for each day you refuse to comply with this Order and for punitive damages up to three times the amount of any costs incurred by the Department as a result of your failure to comply, pursuant to" sections 25359 (as enacted by Stats. 1983, ch. 1044, § 19, p. 3673) and 25361.

Foster-Gardner tendered defense of the DTSC Order to four of its insurers, National Union Fire Insurance Company of Pittsburgh, PA, and Pacific Indemnity Company (Pacific), Fremont Indemnity Company (Fremont), and Ranger Insurance Company (Ranger) (insurers).[2] Pacific's policies were in effect from May 1984 to May 1986, Fremont's policies from June 1983 to July 1984, and Ranger's policies from December 1970 to December 1980. All insurers had issued CGL polices containing the following language with minor nonmaterial differences: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . bodily injury or . . . property damage to which [this] insurance applies, caused by an occurrence, . . . and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, . . . and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or

---

[2]National Union Fire Insurance Company did not join in the insurers' petitions for review, and is not a party in this court.

judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." The policies further provided, "Regardless of the number of . . . claims made or suits brought on account of bodily injury or property damage, the company's liability is limited. . . ." The Pacific and Fremont policies provided, "The company may pay any part or all of the deductible amount to effect settlement of any claim or suit. . . ." While the policies consistently treated the terms "suit" and "claim" as separate and noninterchangeable, these terms were not defined in the policies.[3]

The insurers either refused to defend, or agreed to defend subject to a reservation of rights and have not, in Foster-Gardner's view, adequately funded that defense. On August 2, 1994, Foster-Gardner filed this action seeking as relevant here a declaration of the insurers' defense obligations and recovery of defense costs. On June 1, 1995, Foster-Gardner filed a motion for summary judgment or in the alternative summary adjudication. The parties ultimately stipulated that the insurers' oppositions to Foster-Gardner's motions would be deemed cross-motions for summary judgment. The trial court entered summary judgment in favor of the insurers in part on the ground that the insurers had no duty to defend because the DTSC Order was not a "suit."

The Court of Appeal reversed. It noted that "A Determination and Order does not commence either a lawsuit in court or an adjudicative procedure before an administrative tribunal. Instead, it is simply an order from an administrative agency." The court held, however, that the DTSC Order constituted a "suit" within the meaning of the policy, and hence gave rise to the insurers' duty to defend. "This conclusion rest[ed] on four factors: the nature and irrevocable consequences of HSAA 'Superfund' procedures which take place before a traditional lawsuit is filed in court, the lack of definition of the operative terms 'suit' and 'claim' in the insurance policies, the general standards for interpretation of insurance policies in California and how those standards have been applied, and the nature of the analysis applied by the California Supreme Court in *AIU Ins. Co.* v. *Superior Court*

---

[3]This question is raised with respect to policies issued *prior* to 1986. In 1986, the standard insurance form was amended to define "suit" as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this insurance applies are alleged. 'Suit' includes an arbitration proceeding alleging such damages to which you must submit or submit with our consent." (4 Cal. Insurance Law & Practice (1997) appen. C, p. 49-157, quoting Insurance Services Office's commercial general liability coverage form; see also 3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice (1997) § 59.07[2], p. 59-53.) Since then, this definition has been refined. Moreover, policies issued after 1985 generally include an absolute pollution exclusion. (Croskey et al., Cal. Practice Guide: Insurance Litigation 2 (The Rutter Group 1997) ¶ 7:2085, p. 7H-28.)

(1990) 51 Cal.3d 807 [274 Cal.Rptr. 820, 799 P.2d 1253](*AIU*)." It reasoned, "Were this case presented on a clean slate, the proper resolution of the 'suit' issue would be debatable. . . . In California, however, the application of a nontechnical, 'functional' approach to determine the 'damages' issue in *AIU* lights the way to resolution of the 'suit' issue. There is no principled basis on which a nontechnical, functional analysis could properly control the 'damages' issue in *AIU*, while a strictly technical and literal analysis controlled the 'suit' issue. Neither the term 'suit' nor the term 'claim' is defined in the policies. The terms must therefore be construed in favor of the insured, to the extent consistent with objectively reasonable expectations. Although the proceedings commenced by the Determination and Order clearly do not constitute a traditional lawsuit in a court, neither do they constitute a mere claim which can simply be ignored—without adverse effect—until a traditional lawsuit is filed. The true nature of HSAA 'Superfund' proceedings lies somewhere between a traditional lawsuit in a court and a traditional claim or pre-suit demand which has no effect until enforced by a lawsuit in a court. *AIU* teaches that ambiguities of this sort, produced by the combination of new schemes for remediating pollution plus undefined terms used in standard CGL policies, are to be construed against the insurer."

Soon after, a different division of the same district Court of Appeal reached the opposite conclusion. (*Fireman's Fund Ins. Co.* v. *Superior Court, supra*, 65 Cal.App.4th 1205 (*Fireman's Fund*).) In *Fireman's Fund*, the court considered whether United States Environmental Protection Agency (EPA) notices that the insured, Vickers Incorporated, was a potentially responsible party (PRP) in a Comprehensive Environmental Response, Compensation and Liability Act action (CERCLA) (42 U.S.C. § 9601 et seq.), as amended by the Superfund Amendments and Reauthorization Act, 42 United States Code section 9601 et seq., constituted a "suit."[4] The court held that the words at issue were clear and unambiguous, and that the insurer had no duty to defend the EPA notices. The court stated, "Foster-Gardner's failure to consider the threshold issues—the plain meaning of 'suit' and 'claim' and whether those terms are ambiguous—is fatal to its analysis and to its decision to rewrite an insurance policy to afford coverage where none was purchased." (65 Cal.App.4th at p. 1212.)

---

[4]More than 35 states, including California, have enacted laws similar to CERCLA. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:1981, p. 7H-8.) HSAA is the California counterpart to CERCLA. (*Ibid.*) Although the HSAA incorporates many CERCLA concepts, it is not identical. No distinction, however, between HSAA and CERCLA pertinent to the proper interpretation of the term "suit" in a CGL policy has been cited. Cases involving both CERCLA and state Superfund programs similar to the HSAA are relied on by both sides and are considered in this opinion.

We granted the insurers' petition for review in this case. We subsequently granted plaintiff Vickers Incorporated's petition for review in *Fireman's Fund, supra,* 65 Cal.App.4th 1205,█ and deferred further action pending consideration and disposition of the related issues here.

## II. DISCUSSION

### A. Background

#### 1. Relevant HSAA Procedures[5]

Whenever DTSC "determines that there may be an imminent or substantial endangerment to the public health or welfare or to the environment, because of a release or threatened release of a hazardous substance," it has three options. (§ 25358.3, subd. (a).) Generally, in August 1992 and currently it could (1) "[o]rder any responsible party or parties to take appropriate removal or remedial action necessary to protect the public health and safety and the environment," as was done in this case; (2) "[t]ake or contract for any necessary removal or remedial action"; or (3) "[r]equest the Attorney General to secure the relief as may be necessary to abate the danger or threat" in the superior court in the county in which "the threat or danger occurs." (§ 25358.3, subd. (a)(1)-(3), as amended by Stats. 1989, ch. 1032, § 21, pp. 3576-3577; 3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice, *supra,* § 55.02[4], pp. 55-13 to 55-14.) Here, DTSC chose the first option.

Currently, but not in August 1992, the HSAA expressly provides that "the responsible party [shall be given] an opportunity to assert all defenses to the order." (§ 25358.3, subd. (a)(1).) These defenses are limited, and include acts of God, war, or a third party, the innocent landowner defense, and the statute of limitations. (§§ 25323.5, subd. (b), 25360.4; 3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice, *supra,* §§ 56.10[3][a] to 56.10[4], pp. 56-31 to 56-39.)

As noted, the Order here required Foster-Gardner to prepare a remedial investigation and feasibility study. " 'Remedial investigation' means those actions deemed necessary by the [DTSC] to determine the full extent of a hazardous substance release at a site, identify the public health and environment threat posed by the release, collect data on possible remedies, and otherwise evaluate the site for purposes of developing a remedial action

---

[5]The HSAA will be repealed on January 1, 1999, "unless a later enacted statute, which is enacted before January 1, 1999, deletes or extends that date," and certain other conditions related to bond repayment occur. (§ 25395.)

plan." (§ 25322.2.) " 'Feasibility study' means the identification and evaluation of technically feasible and effective remedial action alternatives to protect public health and the environment, at a hazardous substance release site, or other activities deemed necessary by the [DTSC] for the development of a remedial action plan." (§ 25314.)

The final RAP issued by the DTSC establishes the cleanup option selected for the site. (3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice, *supra*, § 55.26[1], p. 55-76.) It also includes "a nonbinding preliminary allocation of responsibility among all identifiable potentially responsible parties at a particular site." (§ 25356.1, subd. (e).) "The PRPs identified in the final RAP have three options: (1) assume cleanup responsibility based on the RAP, (2) litigate, or (3) agree to binding arbitration. If a PRP does not choose any of these options, the DTSC . . . will begin the cleanup and collect the costs through a subsequent action." (3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice, *supra*, § 55.26[1], p. 55-76.)

A PRP named in a final RAP may seek judicial review of the plan by filing a petition for writ of mandate pursuant to Code of Civil Procedure section 1085. (§ 25356.1, subd. (g)(1); 3 Manaster & Selmi, Cal. Environmental Law & Land Use Practice, *supra*, § 55.26[2], p. 55-76.) The court must uphold the RAP if it is based on substantial evidence available to the DTSC. (§ 25356.1, subd. (g)(2).) Currently, but not in August 1992, the HSAA specifies that judicial review of any issues concerning the adequacy of any response action taken or ordered by the DTSC is limited to the administrative record. (§ 25357.5, subd. (a).) "Otherwise applicable principles of administrative law shall govern whether any supplemental materials may be considered by the court." (*Ibid.*)

If the DTSC has incurred costs and seeks to compel recovery of them, it must file a lawsuit in court. (§ 25360, subds. (a), (c); see *id.*, former subd. (d), as amended by Stats. 1989, ch. 269, § 40, p. 1338; *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 815-816 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*).) If the DTSC decides to file a cost recovery action, "[n]othing in this section deprives a party of any defense he or she may have." (§ 25360, subd. (c); see *id.*, former subd. (d), as amended by Stats. 1989, ch. 269, § 40, p. 1338.) There is strict liability for any recoverable costs or expenses. (§ 25363, subd. (d).) However, generally, "any party found liable for any [recoverable] costs or expenditures . . . who establishes by a preponderance of the evidence that only a portion of those costs or expenditures are attributable to that party's actions, shall be required to pay only for that portion." (§ 25363, subd. (a).)

Currently, but not in August 1992, a PRP that fails to comply with an Order without sufficient cause is subject to a civil penalty of up to $25,000

for each day of noncompliance. (§ 25359.2.) This liability may be imposed either in a civil action or administratively. (*Ibid.*) In addition, in August 1992, generally a party who failed to comply with an Order was liable for "punitive damages up to three times the amount of any costs" incurred by the DTSC "as a result of the failure to take proper action." (§ 25359, as enacted by Stats. 1983, ch. 1044, § 19, p. 3673; cf. § 25359, as amended by Stats. 1992, ch. 1237, § 1, p. 5819.)

### 2. *Relevant Insurance Law Principles*

■ "While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West* v. *Superior Court* (1992) 2 Cal.4th 1254, 1264 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see *AIU, supra*, 51 Cal.3d at pp. 821-822.) "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264.) "Such intent is to be inferred, if possible, solely from the written provisions of the contract." (*AIU, supra*, 51 Cal.3d at p. 822.) "If contractual language is clear and explicit, it governs." (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264.)

"A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (*Waller* v. *Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619]; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867 [21 Cal.Rptr.2d 691, 855 P.2d 1263].) The fact that a term is not defined in the policies does not make it ambiguous. (*Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co., supra*, 5 Cal.4th at p. 866; *Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1264; *Castro* v. *Fireman's Fund American Life Ins. Co.* (1988) 206 Cal.App.3d 1114, 1120 [253 Cal.Rptr. 833].) Nor does "[d]isagreement concerning the meaning of a phrase," or " 'the fact that a word or phrase isolated from its context is susceptible of more than one meaning.' " (*Castro* v. *Fireman's Fund American Life Ins. Co., supra*, 206 Cal.App.3d at p. 1120.) " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West* v. *Superior Court, supra*, 2 Cal.4th at p. 1265, italics omitted.) "If an asserted ambiguity is not eliminated by the language and context of the policy, courts then invoke the principle that ambiguities are generally construed against the party who caused the uncertainty to exist (i.e., the insurer) in order to protect the insured's reasonable expectation of coverage." (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048].)

■ An insurer has a duty to defend when the policy is ambiguous and the insured would reasonably expect the insurer to defend him or her against the suit based on the nature and kind of risk covered by the policy, or when the underlying suit potentially seeks damages within the coverage of the policy. (*La Jolla Beach & Tennis Club, Inc.* v. *Industrial Indemnity Co., supra,* 9 Cal.4th at p. 38; *Montrose Chemical Corp.* v. *Superior Court* (1993) 6 Cal.4th 287, 299 [24 Cal.Rptr.2d 467, 861 P.2d 1153]; *Gray* v. *Zurich Insurance Co.* (1966) 65 Cal.2d 263, 271-275 [54 Cal.Rptr. 104, 419 P.2d 168].) The duty to defend is "a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose Chemical Corp.* v. *Superior Court, supra,* 6 Cal.4th at p. 295, original italics; *Buss* v. *Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766][defense duty "arises as soon as tender is made"].) It extends to allegations that are actually and even only potentially covered. (*Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 46.) Indeed, the insurer must defend the entire action even when only one of several causes of action is potentially covered. (*Horace Mann Ins. Co.* v. *Barbara B.* (1993) 4 Cal.4th 1076, 1081 [17 Cal.Rptr.2d 210, 846 P.2d 792]; *Buss* v. *Superior Court, supra,* 16 Cal.4th at p. 49 [insurer "cannot parse the claims, dividing those that are at least potentially covered from those that are not"].)

### 3. *Out-of-state Authority*

While the issue of whether environmental agency activity prior to the filing of a complaint is a "suit" within the meaning of a CGL policy is one of first impression in California, numerous other state and federal courts have considered this question. These cases have arisen as a consequence either of underlying CERCLA proceedings, underlying state proceedings pursuant to statutes modeled after CERCLA (similar to the HSAA), or both. Essentially three approaches have evolved, generally referred to as the literal, functional, and hybrid approaches.

### a. *The "literal meaning" approach*

Under the "literal meaning" approach, the term "suit" is deemed unambiguous, referring to actual court proceedings initiated by the filing of a complaint. When no complaint has been filed, there is no "suit" the insurer has a duty to defend.[6] (*Lapham-Hickey Steel* v. *Protection Mut. Ins., supra,* 655 N.E.2d at p. 847 [word "suit" is unambiguous, and its plain meaning

---

[6](See, e.g., *Lapham-Hickey Steel* v. *Protection Mut. Ins.* (1995) 166 Ill.2d 520 [211 Ill.Dec. 459, 655 N.E.2d 842, 843, 846-848] ["suit" in an all risks policy clearly and unambiguously refers to a proceeding in a court of law; hence there is no duty to defend environmental

requires the filing of a complaint in a court of law before an insurer's duty to defend is triggered]; *Ray Industries, Inc.* v. *Liberty Mut. Ins. Co., supra,* 974 F.2d at p. 761 [Term "suit" has a "plain and unambiguous meaning" that excludes PRP letters, because a "suit" is "an attempt to gain an object *in the courts.* The term refers to formal legal proceedings, as opposed to demands and other tactics that, however powerful, are not enforced by a court of law." (Original italics.)].)

In addition to the plain meaning of the term "suit," some courts find support for their conclusion in the connection between the filing of a complaint and the duty to defend. Generally the issue of whether an insurer's duty to defend has arisen is determined by looking to the allegations in the underlying complaint and comparing these allegations to the policy provisions. (*Lapham-Hickey Steel* v. *Protection Mut. Ins., supra,* 655 N.E.2d at p. 847 ["[T]he duty to defend extends . . . not to allegations, accusations or claims which have not been embodied within the context of a complaint."]; *City of Edgerton* v. *General Cas. Co., supra,* 517 N.W.2d at p. 477.) "These references to the 'complaint' clearly indicate that insurers generally contract to defend suits filed in a court, rather than mere allegations or threats." (*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co., supra,* 974 F.2d at p. 763.) Where there is no complaint, there is no "suit" against which the insurer can defend. (*Lapham-Hickey Steel* v. *Protection Mut. Ins., supra,* 655 N.E.2d at p. 847.)

Moreover, many courts note that the standard policy language differentiates between a "claim" and a "suit." "If all of the policy's language is to be

agency letters and proposed consent decree]; *City of Edgerton* v. *General Cas. Co.* (1994) 184 Wis.2d 750 [517 N.W.2d 463, 473, 48 A.L.R.4th 803] ["neither a PRP letter nor a comparable notification letter by a state agency . . . triggers the insurers' duty to defend"]; *Patrons Oxford Mut. Ins.* v. *Marois* (Me. 1990) 573 A.2d 16, 20 [administrative proceeding is not a "suit"]; *Technicon Electronics* v. *Am. Home Assur.* (1988) 141 A.D.2d 124 [533 N.Y.S.2d 91, 104-105], affd. 74 N.Y.2d 66 [544 N.Y.S.2d 531, 542 N.E.2d 1048, 1051] [dicta] [EPA letter inviting voluntary action "not the equivalent of the commencement of a formal proceeding" within the meaning of a CGL policy]; *Aetna Cas. & Sur. Co.* v. *General Dynamics Corp.* (8th Cir. 1992) 968 F.2d 707, 713-714 [applying Mo. law: EPA demand letters are not "suit[s]" for damages]; *Joslyn Mfg. Co.* v. *Liberty Mut. Ins. Co.* (W.D.La. 1993) 836 F.Supp. 1273, 1279, affd. (5th Cir. 1994) 30 F.3d 630, 635 ["[C]ompliance orders issued by the [Department of Environmental Quality] do not rise to the level of a suit which would invoke Liberty Mutual's duty to defend."]; *Metro Wastewater Reclamation* v. *Continental Cas.* (D.Colo. 1993) 834 F.Supp. 1254, 1258 [EPA enforcement action is not "suit" within the meaning of a CGL policy]; *Harleysville Mut. Ins.* v. *Sussex County, Del.* (D.Del. 1993) 831 F.Supp. 1111, 1131, affd. (3d Cir. 1994) 46 F.3d 1116 [PRP letters do not constitute a "suit"]; *Becker Metals Corp.* v. *Transportation Ins. Co.* (E.D.Mo. 1992) 802 F.Supp. 235, 241 ["EPA enforcement action is not a 'suit' that is entitled to a defense under the policy language"]; *Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.* (6th Cir. 1992) 974 F.2d 754, 758, 764 [applying Mich. law: PRP letter not a "suit"]; but see *Anderson Development Co.* v. *Travelers Indem. Co.* (6th Cir. 1995) 49 F.3d 1128, 1131 [Michigan has, since *Ray Industries, Inc.,* ruled on the question of whether a PRP letter is the functional equivalent of a "suit" and concluded that it is].)

given effect, then the words 'suit' and 'claim' as used within [the policy] must have different meanings. . . . While [the insurer] has the power to investigate any claim, it has the duty to defend only suits. If the word 'suit' was broadened to include claims, in the face of policy language which distinguishes between the two, any distinction between these two words would become superfluous." (*Lapham-Hickey Steel* v. *Protection Mut. Ins.*, *supra*, 655 N.E.2d at pp. 847-848; *Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d at p. 762 [court construed the term "suit" narrowly in order to maintain policy distinction between "suit" and "claim"].)

Other courts conclude that interpreting "suit" to mean an action initiated by the filing of a complaint recognizes the variety of options available to the EPA in enforcing CERCLA and state agencies enforcing such laws as the HSAA. (*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d at p. 762.) Under CERCLA (and the HSAA), agencies have express authority to file a lawsuit to recover all costs of removal or remedial action. (974 F.2d at p. 762) Or they may chose not to file a lawsuit in a particular case. "Like other claimants, the EPA threatens litigation and makes other efforts to pressure potentially liable parties; but these threats, however seriously they may be taken, do not constitute a lawsuit." (*Ibid.*)

Because they conclude the term "suit" does not encompass administrative agency orders and other activity, courts have noted that the insurer would be put in the position of providing coverage for which it did not contract or receive payment. (*City of Edgerton* v. *General Cas. Co., supra*, 517 N.W.2d at p. 476, fn. 26 ["The original risk assessment becomes a nullity if the language of the policy is redefined in order to expand coverage beyond what was planned for by the insurer in the contract of insurance."].)

Finally, at least one court has held that because in that particular jurisdiction an insurer has no duty to indemnify an insured for cleanup costs pursuant to a CERCLA order, there is no duty to defend environmental agency administrative proceedings. (*Becker Metals Corp.* v. *Transportation Ins. Co., supra*, 802 F.Supp. at p. 240; see also *Aetna Cas. & Sur. Co.* v. *General Dynamics Corp., supra*, 968 F.2d at p. 714.)

b. *The "functional" and "hybrid" approaches*

Under the "functional" approach, any receipt of a PRP letter or other precomplaint environmental agency activity constitutes a "suit."[7] In a refinement of the "functional" approach, other courts have determined that a PRP

---

[7](See, e.g., *Mich. Millers Mut. Ins.* v. *Bronson Plat.* (1994) 445 Mich. 558 [519 N.W.2d 864, 871] ["the legal proceeding initiated by the receipt of [a PRP letter] is the functional

letter or other precomplaint environmental agency action is a "suit" only if it is sufficiently coercive and threatening. (*Ryan* v. *Royal Ins. Co. of America* (1st Cir. 1990) 916 F.2d 731, 741-742 [applying N.Y. law: "origins and purpose of the duty to defend seem best accommodated . . . by focusing . . . [on the] coerciveness, adversariness, the seriousness of the effort with which the government hounds an insured, and the gravity of imminent consequences"; these do not include a state environmental agency's "implied invitation to voluntary action"].)[8] This is the "hybrid" approach. These courts essentially do not consider a mere preliminary notification to be a "suit," but conclude a proceeding becomes a "suit" if it progresses beyond the mere notification or request for voluntary action stage. Because the Order received by Foster-Gardner in this case is considerably past the mere notification stage, we need not differentiate between the two approaches here.

Under both the functional and hybrid approach, the term "suit" is deemed ambiguous, and interpreted to refer to proceedings other than those in a court

equivalent of a suit brought in a court of law"]; *SCSC Corp.* v. *Allied Mut. Ins. Co.* (Minn. 1995) 536 N.W.2d 305, 315 ["suit" includes a request for information]; *Coakley* v. *Maine Bonding and Cas. Co.* (1992) 136 N.H. 402 [618 A.2d 777, 787] [PRP notice and state agency administrative order are a "suit," and "[a]dministrative proceedings are the equivalent of court proceedings for purposes of the 'suit' requirement"]; *A.Y. McDonald Industries.* v. *INA* (Iowa 1991) 475 N.W.2d 607, 628 ["suit" includes "any attempt to gain an end by legal process"]; *Spangler Const.* v. *Industries Crankshaft* (1990) 326 N.C. 133 [388 S.E.2d 557, 570-571] ["compliance orders were an attempt by the State to 'gain an end by legal process,'" and hence were "'suits' giving rise to the insurers' duty to defend"]; *Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp.* (9th Cir. 1991) 948 F.2d 1507, 1517 [applying Idaho law]; *Avondale Industries, Inc.* v. *Travelers Indem. Co.* (2d Cir. 1989) 887 F.2d 1200, 1206 [Applying N.Y. law: "We have little trouble viewing this administrative proceeding as a suit. The demand letter commences a formal proceeding against Avondale, advising it that a public authority has assumed an adversarial posture toward it, and that disregard of the [state agency's] demands may result in the loss of substantial rights by Avondale."]; *Morrisville Water & Light Dept.* v. *USF&G* (D.Vt. 1991) 775 F.Supp. 718, 732 ["EPA's letter to Morrisville was the equivalent of the start of a lawsuit. The EPA clearly warned Morrisville of the probability of imminent government action, enforceable by a court of law, if it did not respond to the letter."].)

[8](See, e.g., *Hazen Paper* v. *U.S. Fidelity and Guar.* (1990) 407 Mass. 689 [555 N.E.2d 576, 580-581] ["The consequences of the receipt of the EPA letter were so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately"; no such duty arose as to a different agency letter because it "does not allege the occurrence of any damage . . . within the policy coverage."]; *Professional Rental* v. *Shelby Ins.* (1991) 75 Ohio.App.3d 365 [599 N.E.2d 423, 428] ["suit" includes "substantial efforts which *force* the insured to take action or suffer serious consequences if the insured fails to cooperate" (Original italics.)]; *id.* at p. 430; *Hartford Acc. & Indem. Co.* v. *Dana Corp.* (Ind.Ct.App. 1997) 690 N.E.2d 285, 296-297 ["[W]e hold that § 104 requests coupled with a specific allegation of liability, § 106 orders, § 107 demands, and § 122(e) offers, as well as analogous proceedings by state and local agencies, are 'suits,' triggering Fireman's Fund's duty to defend. Less coercive actions, however, do not rise to the level of 'suit.' These would include mere notification or investigation when no enforcement action is contemplated."]; *Ryan* v. *Royal Ins. Co. of America, supra,* 916 F.2d at p. 741.)

of law initiated by the filing of a complaint. Some courts are persuaded that "the fact that another reasonable interpretation of the term 'suit' exists simply creates an ambiguity." (*Morrisville Water & Light Dept.* v. *USF&G, supra,* 775 F.Supp. at p. 733.) Having found ambiguity, courts then determine that an insured would reasonably expect a defense of the administrative agency's order or other activity. (*Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp., supra,* 948 F.2d at p. 1517 ["[A]n 'ordinary person' would believe that the receipt of a PRP notice is the effective commencement of a 'suit' necessitating a legal defense. The PRP letter forced Gulf to hire technical experts and lawyers to protect its interests in connection with EPA's actions."].)

For many courts that conclude an administrative action is a "suit," "[o]f critical importance is the creation of the administrative record and the role it may play in future litigation. Documentation sought by the EPA, and which [the insured] must produce under the force of law, will determine the amount and type of waste generated by [the insured] and discharged onto the site. Given the strict liability stance of CERCLA, this information is all that is needed to establish both the fact and proportional share of [the insured's] liability at the site. [¶] Moreover, because the EPA may implement any investigatory and remedial action it deems necessary at the site, subject only to an abuse of discretion review, the total cost of the project will also be determined before litigation is brought. The significant authority given to the EPA in such matters allows it essentially to usurp the traditional role of a court of law in determining and apportioning liability. Such matters are concluded by the EPA before the action is ever brought to court." (*Mich. Millers Mut. Ins.* v. *Bronson Plat., supra,* 519 N.W.2d at pp. 871-872, italics and fns. omitted; *Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp., supra,* 948 F.2d at p. 1516 ["Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe implications. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insured's rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process."]; *Avondale Industries, Inc.* v. *Travelers Indem. Co., supra,* 887 F.2d at p. 1206; *Morrisville Water & Light Dept.* v. *USF&G, supra,* 775 F.Supp. at p. 733; *Hazen Paper Co.* v. *U. S. Fidelity and Guar., supra,* 555 N.E.2d at p. 581.)

Other courts have stated that "[c]overage should not depend on whether the EPA may choose to proceed with its administrative remedies or go directly to litigation." (*Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp., supra,* 948 F.2d at p. 1517.) "If the threat is clear then coverage should be provided." (*Id.* at p. 1518.)

. In response to the concern that "a decision in [the insurer's] favor might blur the distinction between 'claim' and 'suit' evidenced in [the] insurance policies," one court has stated, "we wish to emphasize that this opinion should in no way be viewed as intimating that every request for relief should be considered the initiation of a suit that the insurers are obliged to defend. Rather, our determination on this issue is made primarily based on the unique aspects of CERCLA actions and the authority given to EPA under the statute. . . . Accordingly, we do not disturb the basic claim/suit distinction contained within the subject insurance policies." (*Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra*, 519 N.W.2d at p. 871, fn. 13.)

Finally, courts have relied on certain policy considerations, such as the need to encourage prompt and efficient hazardous waste cleanup. "[I]f the receipt of a PRP notice is held not to trigger the duty to defend under CGL policies, then insureds might be inhibited from cooperation with the EPA in order to invite the filing of a formal complaint. [¶] . . . [¶] . . . A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements. . . . It is in the nation's best interests to have hazardous waste cleaned up effectively and efficiently." (*Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp.*, *supra*, 948 F.2d at p. 1517; *Avondale Industries, Inc.* v. *Travelers Indem. Co.*, *supra*, 887 F.2d at p. 1206 ["common sense argues that for Travelers to proffer a defense now is better for it, Avondale, and the public interest in a prompt cleanup of the hazardous waste"]; *Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra*, 519 N.W.2d at p. 872 ["[F]rom a policy perspective, . . . the position urged by [the insurers] would only increase the litigiousness of this already extensively litigated area of the law. Limiting an insurer's duty to defend to an actual court proceeding preceded by a complaint would merely encourage PRPs to decline 'voluntary' involvement in site cleanups, waiting instead for an actual lawsuit to be brought in order to receive insurance coverage. This would have the effect of substantially protracting the cleanup of contaminated sites."].)

### 4. *AIU*

In *AIU*, *supra*, 51 Cal.3d 807, the United States and local administrative agencies filed suits against FMC Corporation (FMC), seeking relief for alleged violations of state and federal environmental laws, including CERCLA and the HSAA. (*Id.* at p. 815.) FMC in turn sought declaratory relief against its insurers determining that any costs it might become obligated to pay as a result of the injunctive relief and/or reimbursement ordered in the third party suits were covered under its CGL policies. (*Id.* at p. 816.) .

The insurance policies at issue provided coverage to FMC for all sums FMC became legally obligated to pay as "damages" (under two policy

forms) or "ultimate net loss" (under a third) because of property damage. (*AIU, supra,* 51 Cal.3d at p. 814.) We determined whether (i) any adverse orders issued in those suits would "legally obligate" FMC to pay such costs, (ii) the costs would constitute "damages" or "ultimate net loss," and (iii) such costs would be incurred because of "property damage." (*Id.* at p. 818.) We noted that "[o]nly if all three conditions [were] fulfilled [would] the insurers' duty to provide coverage arise under the policies." (*Ibid.*)

The first requirement for coverage was that FMC be legally obligated to pay the costs at issue. We stated, "Because it is clear that, if FMC is held liable in the third party suits, it will be 'obligated' to pay for whatever relief the courts order, the only remaining question is whether that obligation may be considered 'legal' under applicable rules of interpretation." (*AIU, supra,* 51 Cal.3d at p. 824.) We declined to interpret the phrase "legally obligated" as providing coverage for only those actions traditionally brought in law and not in equity. (*Id.* at pp. 824-825.) We observed that because the distinction between law and equity in California had generally been abolished, "even a legally sophisticated policyholder might not anticipate that the term 'legally obligated' precludes coverage of equitably compelled expenses." (*Id.* at p. 825.) "Thus, as a matter of plain meaning, the term 'legally obligated' covers injunctive relief and recovery of response costs." (*Ibid.*) Moreover, even if the phrase raised doubts about whether a law-equity distinction was intended, it would be unreasonable to conclude that it unambiguously incorporated this sophisticated distinction into the policies. Any such ambiguity was resolved in favor of coverage. (*Ibid.*) "Whether the term 'legally obligated' is ambiguous or not, therefore, we conclude that it encompasses the types of relief sought in the third party suits." (*Ibid.*)

We next determined whether FMC's prospective legal obligation in the third party suits was to pay "damages." (*AIU, supra,* 51 Cal.3d at p. 825.) In so doing, we rejected the construction of the term "damages" as " 'any sum expended under sanction of law' " or "sums paid to third persons as a result of 'legal claims.' " (*Id.* at p. 827.) "Although we agree that a layperson might reasonably define 'damages' in such broad terms, it is unlikely that he would do so in the context of the coverage provision at issue here, taken as a whole." (*Ibid.*) Instead, we noted that "the statutory and dictionary definitions of 'damages' share several basic concepts. Each requires there to be 'compensation,' in 'money,' 'recovered' by a party for 'loss' or 'detriment' it has suffered through the acts of another." (*Id.* at p. 826, fn. omitted.)

In determining whether reimbursement of government response costs constituted "damages," we concluded that the first element of the statutory and dictionary definitions of "damages" was fulfilled. (*AIU, supra,* 51 Cal.3d

at p. 828.) The "agencies suffer 'loss' or 'detriment' in two separate ways when they incur response costs under CERCLA and similar statutes. First, release of hazardous waste into groundwater and surface water constitutes actual harm to property in which the state and federal governments have an ownership interest; this harm is 'detriment' in statutory terms. [Citations.] Second, the agencies' out-of-pocket expenses of investigating and removing the waste as required by statute is 'loss' incurred as a direct result of harm allegedly created through the unlawful act or omission of FMC." (*Id.* at pp. 828-829.)

We also concluded that the second element of statutory and dictionary definitions of "damages" was fulfilled. "FMC's reimbursement of government response costs is monetary 'compensation' for the loss suffered by the agencies when they proceed with environmental cleanups." (*AIU, supra*, 51 Cal.3d at p. 829.)

We rejected the insurers' argument that CERCLA intended that reimbursement of response costs be treated as conceptually distinct from recovery of "damages." (*AIU, supra*, 51 Cal.3d at pp. 830-831.) We stated, "[o]ur ultimate conclusion as to whether reimbursement of response costs is 'damages' for insurance purposes is, as noted above, predominantly a question of how, under *state law*, insurance policies should be interpreted. [Citations.] We are not bound by distinctions or definitions contained in CERCLA itself, if such distinctions do not reflect the intent of the parties to the CGL policies at the time of their formation. For this reason, even to the extent that CERCLA distinguishes between response costs and damages, this fact seems immaterial to the interpretation question at issue in this case. The parties' intent in entering the CGL policies could not possibly have been influenced by the niceties of statutory language adopted many years after the policies were drafted." (*Id.* at p. 831, original italics.)

We also noted that while reimbursement of response costs was essentially a form of restitution, both restitution and compensatory damages fell within the meaning of "damages" in the policies. (*AIU, supra*, 51 Cal.3d at p. 836.) We observed that "the relief sought in the underlying suits at issue here is not punitive," and distinguished it from those forms of restitution that as a matter of public policy cannot be covered by insurance. (*Id.* at pp. 836-837.)

We next considered whether "any or all of the costs of complying with injunctions issued under CERCLA and similar statutes are 'damages' under the CGL policies." (*AIU, supra*, 51 Cal.3d at p. 838.) We noted that "The statutes on which the third party suits are based provide that, in lieu of remedying contamination and seeking reimbursement, the agencies may

obtain injunctions compelling responsible parties to both cease discharging hazardous waste and clean up damage already present. [Citation.] As courts and commentators have recognized, government cleanup efforts are generally considerably more expensive than cleanups performed by the responsible party. [Citations.] For this reason, federal and state governments generally seek voluntary and involuntary cleanup by the responsible party (pursuant to injunction if necessary) before performing it themselves and seeking reimbursement under CERCLA." (*Id.* at pp. 837-838.)

We noted, "The costs of injunctive relief . . . do not readily satisfy the statutory or dictionary definitions of 'damages.' Because such costs are paid to employees or independent contractors rather than aggrieved parties, they do not directly 'compensate' aggrieved persons for 'loss' or 'detriment.' " (*AIU, supra,* 51 Cal.3d at p. 838.) We concluded, however, that it was unlikely "that the parties to CGL policies intended to cover reimbursement of response costs but not the costs of injunctive relief, at least where the latter costs are incurred—generally at a lower total cost—for exactly the same purposes addressed through governmental expenditure of response costs." (*Ibid.*) In this respect, we noted that unlike traditional injunctive relief, which is generally only available when legal remedies such as monetary compensation are inadequate, "injunctive relief may be available [under CERCLA], even though legal or restitutive remedies are adequate." (*Id.* at p. 840.) In addition, the mere fact that the agencies sought an injunction did not indicate an absence of cognizable property damage or personal injury. Moreover, "in its remedial aspects, the injunction results in exactly the type of expenditures involved in reimbursement of response costs, whether or not the agencies have an adequate remedy in the form of reimbursement." (*Ibid.*) "[I]njunctive relief is an equivalent substitute for the goal of government remedial action." (*Ibid.*) "For these reasons, it would exalt form over substance to interpret CGL policies to cover one remedy but not the other. Given the practical similarity of remedies available under the environmental statutes at issue here, we believe a reasonable insured would expect both remedies to fall within coverage as 'damages.' " (*Ibid.*)

We observed that CERCLA and the HSAA "authorize alternative remedies—injunction and reimbursement—that are relatively interchangeable in a way perhaps not foreseen by the parties at the time they entered the CGL policies. . . . [T]he policies necessarily present some ambiguity in light of statutory schemes that by their very operation tend to eliminate the formal distinction between compensation paid to an aggrieved party and sums expended by the insured under compulsion of injunction. [Citation.] For this reason, although we take the statutory and dictionary definitions . . . to be the 'ordinary and popular' definition of 'damages' for interpretation purposes, we will not apply this definition inflexibly. To the extent that policy

language is ambiguous in light of the way environmental statutes authorize relief, our goal remains to protect the objectively reasonable expectations of the insured." (*AIU, supra,* 51 Cal.3d at p. 828.)

Finally, we observed that "some costs required under environmental injunctions are prophylactic in nature," and stated "these costs are not incurred 'because of property damage,' and therefore are not covered by CGL policies." (*AIU, supra,* 51 Cal.3d at p. 841.) "Until such damage has occurred, whether on the waste site itself or elsewhere, there can be no coverage under CGL policies." (*Id.* at p. 843.)

B. *Analysis*

 Under the policies, the insurers are required to defend a "suit," but have discretion to investigate and settle a "claim." The parties each assert that the word "suit" is clear and unambiguous, but differ on what that meaning is. The insurers assert that the word "suit" in the policies means a civil action commenced by filing a complaint. Anything short of this is a "claim." Foster-Gardner asserts that "suit" means " 'an attempt to gain an end by legal process' before a trial judge or some other dispute resolution authority, as opposed to a threat to do so." Here, it asserts, the Order "is the substantive equivalent to a formal action brought in court." It defines a "claim" as "a threat to initiate . . . legal process or merely a demand as of right." We agree with the insurers.

The Order here essentially required Foster-Gardner to continue monitoring hazardous waste levels at the Site, prepare studies documenting the extent of Site contamination, and draft a proposal for remediating the Site. As the Court of Appeal acknowledged, "A Determination and Order does not commence either a lawsuit in court or an adjudicative procedure before an administrative tribunal. Instead, it is simply an order from an administrative agency. It is only in the event that a [PRP] does not comply with a Determination and Order that an enforcement action in court might follow." As Pacific asserts, "The very fact that the Court can easily determine that an HSAA proceeding is *not* a suit . . . indicates that the Court knows what an actual suit is by the term's use in the policy."

As noted earlier, "A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable." (*Waller* v. *Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 18; *Bay Cities Paving & Grading, Inc.* v. *Lawyers' Mutual Ins. Co., supra,* 5 Cal.4th at p. 867.) The primary attribute of a "suit," as that term is *commonly* understood, is that parties to an action are involved in actual court proceedings initiated by the filing of a complaint. (Black's Law Dict. (6th ed. 1990)

p. 1434, col. 1 ["Suit" is "[a] generic term, of comprehensive signification, referring to any proceeding by one person or persons against another or others in a court of law in which the plaintiff pursues, in such court, the remedy which the law affords him . . . Term 'suit' has generally been replaced by term 'action'; which includes both actions at law and in equity."]; Webster's New Collegiate Dict. (9th ed. 1987) p. 1180 ["suit" is "an action or process in a court for the recovery of a right or claim"].) As the Court of Appeal in *Fireman's Fund* stated, "A 'claim' can be any number of things, none of which rise to the formal level of a suit—it may be a demand for payment communicated in a letter, or a document filed to protect an injured party's right to sue a governmental entity, or the document used to initiate a wide variety of administrative proceedings. . . . While a claim may ultimately ripen into a suit, 'claim' and 'suit' are not synonymous." (*Fireman's Fund, supra,* 65 Cal.App.4th at p. 1216*; see *Phoenix Ins. Co.* v. *Sukut Construction Co., Inc.* (1982) 136 Cal.App.3d 673, 677 [186 Cal.Rptr. 513] [Claim "is a demand for something as a right, or as due. A formal lawsuit is not required before a claim is made."]; cf. *Perzik* v. *St. Paul Fire & Marine Ins. Co.* (1991) 228 Cal.App.3d 1273, 1277 [279 Cal.Rptr. 498] ["[S]uit for damages unambiguously refers to civil litigation . . . that is, lawsuits alleging 'professional liability claims.' "]; *Safeco Surplus Lines Co.* v. *Employer's Reinsurance Corp.* (1992) 11 Cal.App.4th 1403, 1408 [15 Cal.Rptr.2d 58] [" '[T]here is an inherent difference between the 'making' of a claim and the 'bringing' of a lawsuit. The former, by its very nature, involves some kind of notice. The latter only requires the filing of a complaint.' " (Italics omitted.)].) Thus, a reasonable construction of the word "suit" is a lawsuit.

 In contrast, Foster-Gardner's construction of the term "suit" is not reasonable. There is nothing in the policy language to support the interpretation that some precomplaint notices are "suits" and some are not. Rather, the unambiguous language of the policies obligated the insurers to defend a "suit," not, as Foster-Gardner asserts, the "substantive equivalent" of a "suit."

As the Wisconsin Supreme Court has stated, "We find no ambiguity in the term 'suit' as it has been used in the insurance policies. 'Suit' denotes court proceedings, not a 'functional equivalent.' The dissent believes that a reasonable policyholder would view letters from a federal or state agency advising an insured of liability as a 'suit.' To the contrary, the word 'suit' is easily understood and unambiguous to a reasonable policyholder. The proof is in the decisions that hold that a 'PRP letter' is the 'functional equivalent of a suit.' Either there is a suit or there is not. When there is no suit, there is no duty to defend." (*City of Edgerton* v. *General Cas. Co., supra,* 517 N.W.2d at p. 477.)

---

*See Reporter's Note, *ante,* at page 861.

Moreover, the policies do not treat the terms "suit" and "claim" as interchangeable, but consistently treat them separately. (See *ante*, pp. 863-864.) This careful separation indicates that the insurers' differing rights and obligations with respect to "suits" and "claims" were deliberately and intentionally articulated in the policies. (See Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:2048.1, p. 7H-21 [The effect of such policy language is that "an insurer owes a duty to defend 'suits' but no duty to defend 'claims' which have not yet become 'suits.' Instead, the insurer has the discretionary right to investigate and settle 'as it deems expedient.' " (Italics omitted.)].)

In addition, in determining whether they have a duty to defend, we have instructed insurers to "compar[e] the allegations of the complaint with the terms of the policy." (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 26 [It is a "settled rule that the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage under the policy and a corresponding duty to defend."]; *ibid.* ["[T]he determination whether the insurer owes a duty to defend usually is made in the first instance by comparing the allegations of the complaint with the terms of the policy."]; *Montrose Chemical Corp..* v. *Superior Court, supra*, 6 Cal.4th at p. 300 ["The duty to defend is determined by reference to the policy, the complaint, and all facts known to the insurer from any source." (Italics omitted.)].) The parameters of a "suit"—and therefore the limits of a defense—are defined explicitly by the complaint, the policy, and any other information known to the insurer. It is because the insurer's duty to defend depends on the allegations in the *complaint* that the insurer may or may not owe a duty to defend those allegations. (*Waller* v. *Truck Ins. Exchange, Inc.*, *supra*, 11 Cal.4th at p. 26; *Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d at p. 763 ["These references [in duty to defend cases] to the 'complaint' clearly indicate that insurers generally contract to defend suits filed in a court, rather than mere allegations or threats."].)

Furthermore, we have been solicitous of the fact that a declaratory relief action concerning coverage issues may need to be stayed to avoid prejudice to the insured in its defense of an underlying lawsuit. (*Montrose Chemical Corp.* v. *Superior Court, supra*, 6 Cal.4th at p. 301 ["To eliminate the risk of inconsistent factual determinations that could prejudice the insured, a stay of the declaratory relief action pending resolution of the third party suit is appropriate when the coverage question turns on facts to be litigated in the underlying action."] As Pacific asserts, the very notion that an insured may be prejudiced is predicated on the existence of an underlying lawsuit wherein the parties can assemble information through discovery and possess

the power to subpoena information in the coverage action. Absent an underlying lawsuit, there is no such danger.

Indeed, relying, as Foster-Gardner suggests, on the "coerciveness" of a particular notice or Order would introduce a significant element of uncertainty into an insurer's ascertainment of its duty to defend. When and under what circumstances would an Order or other pre-complaint notice or proceeding be considered a "suit"? Would the dollar amount of the insured's potential liability determine "coerciveness"? Who determines what is coercive and what is not? To answer these questions, courts would have to rewrite unambiguous policy language on a case-by-case basis under the guise of interpretation.

Nor would there be any basis for limiting this expanded "suit" definition to environmental agency notices. (See Croskey et al., Cal. Practice Guide: Insurance Litigation 2, *supra*, ¶¶ 7:1856 to 7:1859, pp. 7G-21 to 7G-22 [noting that Court of Appeal's opinion in this case arguably would mean an insurer has an obligation to defend employment discrimination administrative proceedings].) Businesses are frequently required to comply with the regulations of and respond to inquiries by the state or federal Occupational Safety and Health Administration, the Immigration and Naturalization Service, the health department, and the Internal Revenue Service (IRS) prior to the time any complaint is filed. One can imagine that the average business owner might find compliance with an IRS audit or other regulations and inquiries coercive and expensive. That does not mean that these inquiries are transformed into "suits" their insurers are obligated to defend. As amicus curiae Insurance Environmental Litigation Association asserts, Foster-Gardner's position would create "a broad legal-services arrangement under which insurers would step into any dispute that conceivably might ripen into litigation."

Although we reject the proposition that the Order triggered a duty to defend, we fully recognize the seriousness of such an Order. Currently, judicial review of any issues concerning the adequacy of any response action taken or ordered by the DTSC is limited to the administrative record, and Foster-Gardner's available defenses are few. By enacting the HSAA, the Legislature has given extraordinary power to the DTSC, and any company that received an Order would be justified in treating it seriously. Such Orders "may even represent a unique legal creation, with no true parallel in any other area of administrative law. But the fact that the [Legislature] chooses to create a new and more powerful type of claim does not justify our deviating from the plain language of the contracts." (*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d at p. 764.)

Rather, by specifying that only a "suit," and not a "claim" triggers the duty to defend, insurers have drawn an unambiguous line to define and limit their contractual obligation. This delineation encourages stability and efficiency in the insurance system. In exchange for a higher premium, the policies might have obligated the insurer to defend any "demand" against the insurer, or to provide a defense whenever the insured is subject to government compulsion or investigation. They did not. (*AIU, supra,* 51 Cal.3d at p. 837, fn. 15 [The HSAA "expressly *permits* responsible parties to enter into agreements to 'insure, hold harmless, or indemnify a party to the agreement for any costs or expenditures under this chapter.'" (Original italics.)]; § 25364; see *Jaffe* v. *Cranford Ins. Co.* (1985) 168 Cal.App.3d 930, 933 [214 Cal.Rptr. 567] [insurer agrees to pay damages " 'resulting from any claims or suits' "].) Although insureds certainly deserve no less than the benefit of their bargain, insurers should be held liable for no more. (*Ray Industries, Inc.* v. *Liberty Mut. Ins. Co., supra,* 974 F.2d at p. 764 ["By limiting its duty to defend to 'suits,' [the insurer] unambiguously demonstrated its intention to avoid responsibility for any action that fell outside the traditional and well-recognized meaning of that term. This court will not deprive [the insurer] of the benefit of its bargain by forcing it to insure against the creation of a new type of legal action, a risk for which it was not paid."].)

Foster-Gardner asserts that it is not urging this court to ignore the long-recognized distinction between a "claim" and a "suit." Rather, "[t]he plain meaning of the term 'suit' in a standard CGL policy embraces the [DTSC] coercive administrative proceeding—a proceeding that not only determines liability, but also establishes the amount thereof." The Order "is not a 'claim' because it is not a mere threat to initiate legal action, or merely a demand as of right. . . . The [DTSC] is not threatening to institute a legal action to establish Foster-Gardner's alleged liability for response costs, it has done so. . . . [P]ursuant to its order, the [DTSC] will make findings of fact and determinations of law which will determine Foster-Gardner's alleged liability, subject only to the appellate review of a trial court."

As noted earlier, Foster-Gardner's argument has proved of "critical importance" to other courts. (See *ante,* p. 873.) In our view, however, even if many of the factual predicates for any future lawsuit are determined either prior or in response to the Order, that does not ineluctably lead to the conclusion that the policies' language must be interpreted to require a duty to defend such an Order. Indeed, in even simpler, more routine insurance claims, information that may prove damaging to the insured is gathered prior to the filing of a lawsuit. ■ For example, "[i]t is well established that an insurer is not required to provide a criminal defense to an insured under a liability policy obligating the insurer to pay 'damages' for which the insured

is found liable." (*Stein* v. *International Ins. Co.* (1990) 217 Cal.App.3d 609, 614 [266 Cal.Rptr. 72]; *Perzik* v. *St. Paul Fire & Marine Ins. Co.*, *supra*, 228 Cal.App.3d at pp. 1276-1278; *Jaffe* v. *Cranford Ins. Co.*, *supra*, 168 Cal.App.3d at p. 934.) Nevertheless, a guilty verdict against the insured in the criminal proceeding may well affect the insured's ability to meaningfully defend any subsequent civil action. The fact that damaging, perhaps even irrefutable, findings will be made does not mean that a duty to defend arises in the criminal proceeding. (See *Stein* v. *International Ins. Co.*, *supra*, 217 Cal.App.3d at p. 614.) Similarly, in an automobile accident, medical reports are written, collision experts consulted, and other information obtained often long before the institution of any lawsuit. The fact that the insured's liability will be affected by such information does not alter the language of the insurance contract which does not require a defense until the lawsuit is filed.

Along these lines, Foster-Gardner asserts that "should this Court decide to deprive insureds of their entitlement to defense costs for coercive administrative proceedings, this court will also be providing the Carriers with an unintended windfall in the form of reduced indemnity obligations. Specifically, an insured in the administrative action may be able to limit or even eliminate a carrier's indemnity obligations by vigorously defending against claims of alleged damage."

Of course, because we conclude the insurers here did not contract and receive premiums to defend anything but a civil lawsuit, requiring them to defend the Order would result in an unintended windfall for Foster-Gardner. Moreover, it is indeed arguable that an insured's early intervention in a dispute outside the civil action context may reduce any indemnity for which the insurer is ultimately held liable. That does not alter the scope of the insurer's duty to defend. Thus, even if Foster-Gardner is correct that its insurers will ultimately be obligated to indemnify costs incurred as a result of the Order, this merely means that the insurers have an inherent incentive to participate in those proceedings where the costs are ascertained. Under the language of the policy, however, this is a judgment call left solely to the insurer ("the company . . . may make such investigation and settlement of any claim . . . as it deems expedient"). (See *Stein* v. *International Ins. Co.*, *supra*, 217 Cal.App.3d at p. 615; *Harleysville Mut. Ins.* v. *Sussex County, Del.*, *supra*, 831 F.Supp. at p. 1132 [The "insurer may well have an interest in providing a defense early in the administrative proceeding as it may ultimately be called upon to indemnify the insured for liability resulting from that proceeding."].) In any event, as the Court of Appeal in *Fireman's Fund* pointed out, "this anomaly is more imagined than real since insurance companies routinely pay 'claims' that have not ripened into 'suits' and which therefore have not triggered a defense obligation." (*Fireman's Fund*, *supra*, 65 Cal.App.4th at p. 1212, fn. 6.\*)

---

\*See Reporter's Note, *ante*, at page 861.

Foster-Gardner further argues, "The conclusion that coercive administrative actions are 'suits' flows naturally from this Court's holding in *AIU*, that costs incurred to comply with an injunction mandating cleanup or to reimburse a government agency for cleanup expenses under CERCLA and the State Superfund Act constitute 'damages' under a CGL policy. [Citation.] No logical basis exists under California rules of policy interpretation to determine that the term 'damages' under a CGL policy is broad enough to include equitable remedies pursued by government entities, yet that the term 'suit' cannot be read in a similar manner to include the adversarial administrative proceedings in which such damages are sought."

In *AIU*, as set forth above, we acknowledged, "The costs of injunctive relief . . . do not readily satisfy the statutory or dictionary definitions of 'damages.' Because such costs are paid to employees or independent contractors rather than aggrieved parties, they do not directly 'compensate' aggrieved persons for 'loss' or 'detriment.' " (*AIU, supra,* 51 Cal.3d at p. 838.) We concluded, however, that it was unlikely "that the parties to CGL policies intended to cover reimbursement of response costs but not the costs of injunctive relief, at least where the latter costs are incurred—generally at a lower total cost—for exactly the same purposes addressed through governmental expenditure of response costs." (*Ibid.*) In this respect, we noted that unlike traditional injunctive relief, which is only available when legal remedies such as monetary compensation are inadequate, "injunctive relief may be available [under CERCLA], even though legal or restitutive remedies are adequate." (*Id.* at p. 840.) In addition, the mere fact that the agencies sought an injunction did not indicate an absence of cognizable property damage or personal injury. Moreover, "in its remedial aspects, the injunction results in exactly the type of expenditures involved in reimbursement of response costs, whether or not the agencies have an adequate remedy in the form of reimbursement." (*Ibid.*) "[I]njunctive relief is an equivalent substitute for the goal of government remedial action." (*Ibid.*) "For these reasons, it would exalt form over substance to interpret CGL policies to cover one remedy but not the other. Given the practical similarity of remedies available under the environmental statutes at issue here, we believe a reasonable insured would expect both remedies to fall within coverage as 'damages.' " (*Ibid.*)

Here, however, we perceive no elimination in the HSAA of the formal distinction between a "suit" and "claims" which do not rise to the level of a suit. Under section 25358.3, the DTSC is authorized to issue an Order *or* to "[r]equest the Attorney General to secure the relief as may be necessary to abate the danger or threat" in the superior court in the county in which "the threat or danger occurs." (§ 25358.3, subd. (a)(1) & (3), as amended by Stats. 1989, ch. 1032, § 21, pp. 3576-3577; see § 25358.3, subd. (a)(1) &

(3); see *id.*, subds. (e), (g).) Moreover, to compel a party to repay its expended costs, the DTSC must file a lawsuit in court. (§ 25360, subds. (a), (c), see *id.*, former subds. (a) & (d), as amended by Stats. 1989, ch. 269, § 40, p. 1338; see *AIU, supra*, 51 Cal.3d at pp. 815-816.) Thus, the HSAA itself clearly distinguishes between the issuance of an Order and the institution of a civil lawsuit. (See *Ray Industries Inc.* v. *Liberty Mut. Ins. Co.*, *supra*, 974 F.2d at p. 762 ["CERCLA itself recognizes a distinction between lawsuits and PRP notice letters. . . . [T]he EPA has express authority to file a lawsuit . . . ; it has simply chosen not to do so in this case."]; *Harleysville Mut. Ins.* v. *Sussex County, Del.*, *supra*, 831 F.Supp. at p. 1132 ["Recognizing the difference in these approaches provides a clear line of demarcation between situations that do and do not trigger the insurer's duty to defend."].)

Foster-Gardner also argues that because under *AIU*, response costs are "damages" within the coverage of the policies, and the Order is the "proceeding" in which Foster-Gardner's liability for these damages will be determined subject only to review by a trial court, then the insurers have a duty to defend. However, as we have already stated, an insurer does not have a duty to defend each and every proceeding in which there is a potential covered damages or any other factual predicate will be ascertained. Rather, it has a duty to defend a *suit* whenever there is potential coverage. (*Gray* v. *Zurich Insurance Co.*, *supra*, 65 Cal.2d at p. 268, italics added ["the duty to defend arises only if the third party *suit* involves a liability for which the insurer would be required to indemnify the insured" (italics added)]; *Montrose Chemical Corp.* v. *Superior Court*, *supra*, 6 Cal.4th at p. 299.)

Moreover, the proceedings in *AIU* in which "damages" were sought were civil actions, not administrative proceedings. (*AIU, supra*, 51 Cal.3d at p. 815 [the "United States and local administrative agencies . . . filed suits against FMC, seeking relief for alleged violations of CERCLA" and the HSAA]; *id.* at p. 816 ["FMC seeks declaratory relief establishing that the CGL policies cover costs it may become obligated to pay as a result of injunctive relief and/or reimbursement ordered in the third party suits."].) We did not hold that an insurer has a duty to defend when no such suit has been filed. As *Fireman's Fund* observed, "*AIU's* holding—that there is *coverage* for certain *damages* sought in a third party suit prosecuted by the EPA under CERCLA—has nothing to do with whether the carrier has a *duty to defend* when no third party suit has been filed." (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1212, fn. 6, original italics.*) In addition, to the extent the Order seeks prophylactic rather than remedial or mitigative measures, Foster-Gardner's reliance on *AIU* is in any event inapt. (*AIU, supra*, 51 Cal.3d at pp. 841, 843.)

Foster-Gardner asserts that we have recently held in *Aerojet-General Corp.* v. *Transport Indemnity Co.* (1997) 17 Cal.4th 38 [70 Cal.Rptr.2d 118,

---

*See Reporter's Note, *ante*, at page 861.

948 P.2d 909] that "environmental investigation expenses may constitute defense costs that the insurer must pay in fulfilling its duty to defend. . . . Since the Court held that an insurer has a duty to pay investigative costs pursuant to an administrative order, logic dictates that such administrative orders constitute 'suits' triggering the Carriers' duty to defend."

*Aerojet,* however, did not involve the issue of an insurer's duty to defend its insured prior to a complaint being filed. Rather, the issue was "whether site investigation expenses . . . may constitute defense costs that the insurer must incur in fulfilling its duty to defend" or whether such costs were solely indemnification. (*Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at p. 45.) The parties and all but one insurer stipulated that the insurers had or would pay Aerojet's defense costs, and "would litigate whether site investigation expenses were defense costs." (*Id.* at p. 51.) Moreover, Aerojet had been sued in state and federal court by the State of California and the United States in three actions in 1979 and 1986. (*Id.* at p. 47.)

We concluded that "the insured's site investigation expenses constitute defense costs that the insurer must incur in fulfilling its duty to defend if, and only if, the following requirements are satisfied. First, the site investigation must be conducted within the temporal limits of the insurer's duty to defend, i.e., *between tender of the defense and conclusion of the action.* Second, the site investigation must amount to a reasonable and necessary effort to avoid or at least minimize liability. Third and final, the site investigation expenses must be reasonable and necessary for that purpose." (*Aerojet-General Corp.* v. *Transport Indemnity Co., supra,* 17 Cal.4th at pp. 60-61, italics added.) "By contrast, if and to the extent that the site investigation is not conducted within the temporal limits of the insurer's duty to defend . . . the related site investigation expenses cannot even possibly be defense costs that the insurer must incur in fulfilling its duty to defend." (*Id.* at p. 61.)

■ "The duty to defend arises when the insured tenders defense of the third party lawsuit to the insurer." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:604, p. 7B-22.) Prior to the filing of a complaint, there is nothing for the insured *to tender defense of,* and hence no duty to defend arises. It follows therefore that site investigation expenses incurred prior to the instigation of a lawsuit against the insured are not defense costs the insurer must incur. That is because the insurer does not yet have a duty to defend the insured.

Foster-Gardner also asserts that "The potential liability under the [Order] would be overwhelming to most sophisticated business institutions. To

small, family owned businesses such as Foster-Gardner, such potential liability is nearly incomprehensible." We are cognizant of the significant economic consequences that may flow from the Order. "Still, that is not sufficient reason for a court to create new coverage and impose risks not assumed or paid for by the contracting parties." (*Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra*, 519 N.W.2d 864, 881 (dis. opn. of Griffin, J.).) Indeed, we are also cognizant that judicially created insurance coverage leaves "ordinary insureds to bear the expense of increased premiums necessitated by the erroneous expansion of their insurers' potential liabilities." (*Garvey* v. *State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 408 [257 Cal.Rptr. 292, 770 P.2d 704].)

Finally, Foster-Gardner relies on *Taranow* v. *Brokstein* (1982) 135 Cal.App.3d 662 [185 Cal.Rptr. 532], in which the court held that the word "suit" included arbitration proceedings. In *Taranow*, however, the partnership contract at issue required all controversies and claims arising out of the agreement to be arbitrated. (*Id.* at p. 664.) It also provided for attorney fees " '[s]hould any partner be forced to bring suit to enforce the terms of this partnership agreement.' " (*Ibid.*) The court therefore reasonably concluded that for the attorney fee provision to have any effect, the term "suit" would have to be interpreted to include arbitration proceedings. (*Id.* at pp. 667-668.) That is not the situation here. Interpreting "suit" to include only actions commenced by the filing of a complaint does not render the insurer's promise to defend meaningless. Moreover, post-1985 policies generally include arbitration proceedings in the definition of "suit." (See *ante*, fn. 3.)

As noted, cases in other jurisdictions have relied in part on certain policy considerations in determining that environmental agency activity is the "functional equivalent" of a "suit." (*Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp.*, *supra*, 948 F.2d at p. 1517; *Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra*, 519 N.W.2d at p. 872.) In particular, these cases have expressed the concern that a contrary conclusion would increase litigation by encouraging insureds (who want the insurer to cover defense costs) to fail to respond to an administrative order or other inquiries, and let the agency sue them for reimbursement of cleanup costs.

We disagree. Our conclusion that a "suit" is a court proceeding initiated by the filing of a complaint creates a "bright-line rule that, by clearly delineating the scope of risk, *reduces* the need for future litigation. Indeed, it is the position taken by [these other jurisdictions] that will open the flood gates of litigation by inviting, and requiring, a case-by-case determination whether each new and different letter presenting the claim of an administrative agency is to be deemed the 'functional equivalent of a suit brought in a

court of law.' " (*Mich. Millers Mut. Ins.* v. *Bronson Plat., supra*, 519 N.W.2d 864, 881, fn. 18, italics added (dis. opn. of Griffin, J.).)

We also note that in response to the suggestion that "because it is in the nation's best interests to have hazardous waste cleaned up, our courts must construe insurance policies to provide coverage for such remedial work lest the insureds be discouraged from cooperating with the EPA," the Court of Appeal in *Fireman's Fund* aptly stated, "While we agree that it is in everyone's best interests to have hazardous wastes cleaned up, we do not agree that a California court may rewrite an insurance policy for that purpose or for any purpose. This is a contract issue, and imposition of a duty to defend CERCLA proceedings that have not ripened into suits would impose on the insurer an obligation for which it may not be prepared. . . . Whatever merit there may be to these conflicting social and economic considerations, they have nothing whatsoever to do with our determination whether the policy's disjunctive use of 'suit' and 'claim' creates an ambiguity." (*Fireman's Fund, supra*, 65 Cal.App.4th at p. 1214, fn. 8,* see also *AIU, supra*, 51 Cal.3d at p. 818 ["The answer is to be found solely in the language of the policies, not in public policy considerations."].)

▮▮▮ We conclude the Order did not initiate a "suit" within the meaning of the policies. Accordingly, it did not give rise to the insurers' duty to defend.

DISPOSITION

The judgment of the Court of Appeal is reversed.

George, C. J., Baxter, J., and Chin, J., concurred.

**KENNARD, J.**—I dissent.

The majority holds that an administrative agency notice identifying the recipient as a party potentially responsible for environmental pollution, and directing the recipient to assume responsibility for remediation of the pollution, does not trigger an insurer's duty to defend the recipient under a comprehensive general liability (CGL) policy. I would hold that it does.

The issue that this court decides here is one that may arise in the context of either state or federal environmental laws. The issue may arise in the context of proceedings under the federal Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA, 42 U.S.C. § 9601 et seq.) when the Environmental Protection Agency (EPA), having identified a site contaminated with hazardous material and the parties potentially responsible for that contamination, sends a letter to each potentially responsible party (PRP) notifying that party of the EPA's findings. And the issue may

---

*See Reporter's Note, *ante*, at page 861.

arise under various state legislative schemes enacted to supplement and complement CERCLA, including our state's Carpenter-Presley-Tanner Hazardous Substance Account Act (Health & Saf. Code, § 25300 et seq.), when the state agency (here the Department of Toxic Substances Control) sends a similar letter (here an "Imminent and Substantial Endangerment Order and Remedial Action Order") directing a PRP to take or pay for remedial action.

Although this court has not previously addressed the issue of whether a PRP notification letter, under either CERCLA or its state law counterpart, triggers an insurer's duty to defend under a CGL policy, this issue has been addressed many times by other courts. The Courts of Appeal of this state have reached conflicting decisions concerning it, as have state and federal courts in other jurisdictions. By now, the issue has been thoroughly dissected and analyzed, and the arguments on each side are well developed and well known.

The majority draws its arguments and reasoning from the decisions of other courts (and from one dissenting opinion) reaching the result it favors. Arguments and reasoning supporting the opposite conclusion are readily marshaled in the same manner. In particular, the Supreme Courts of Iowa, Massachusetts, Michigan, Minnesota, New Hampshire, and North Carolina, and the Ninth Circuit Court of Appeals (applying Idaho law), have all handed down decisions concluding that a PRP notification letters triggers an insurer's duty to defend under a CGL policy. (*Aetna Cas. & Sur. Co., Inc.* v. *Pintlar Corp.* (9th Cir. 1991) 948 F.2d 1507; *A.Y. McDonald Indus.* v. *INA* (Iowa 1991) 475 N.W.2d 607; *Hazen Paper* v. *U.S. Fidelity and Guar.* (1990) 407 Mass. 689 [555 N.E.2d 576]; *Mich. Millers Mut. Ins.* v. *Bronson Plat.* (1994) 445 Mich. 558 [519 N.W.2d 864]; *SCSC Corp.* v. *Allied Mut. Ins. Co.* (Minn. 1995) 536 N.W.2d 305; *Coakley* v. *Maine Bonding and Cas. Co.* (1992) 136 N.H. 402 [618 A.2d 777]; *Spangler Const.* v. *Indus. Crankshaft* (1990) 326 N.C. 133 [388 S.E.2d 557].) Rather than retrace in detail the familiar path that these courts have laid out, I will summarize the main points that I have found persuasive in reaching a conclusion opposite to the majority's.

Under a CGL policy, the insurer promises to defend any "suit" against the insured seeking damages within the scope of the policy's indemnity provisions. The issue here is whether the term "suit" includes an administrative proceeding that a state agency charged with environmental protection commences by sending to the insured a statutory notification letter identifying the insured as a PRP and ordering the insured to commence the remediation process. The majority's decision that such a notice does not commence a "suit" rests mainly on the proposition that the term "suit" is unambiguous and refers only to a court action commenced by the filing of complaint.

(Maj. opn., *ante*, at p. 879.) Two decisions, one by a Court of Appeal in this state and the other by the Michigan Supreme Court, persuade me that this is not so.

In a 1982 decision joined by Presiding Justice Racanelli and Justice Newsom, Justice Elkington had this to say about the meaning of "suit":

"While the term 'suit' will ordinarily refer to an action commenced in a court of law, it has often been given a much broader meaning. It is not 'essential that the proceeding should be originally instituted in a court.' [Citation.] The word signifies 'the prosecution of any claim, demand, or request, and is much broader than the term "action," and may embrace it, but does not define it.' [Citation.] It is 'in the nature of an action in court.' [Citation.] '"Actions" technically applies only to actions at law, since "action" is narrower than "suit," which denotes any legal proceeding of a civil kind brought by one person against another, and includes actions at law and suits in equity.' [Citation.] It may be 'given a broad meaning' [citation]; it 'is a more general term denoting any legal proceeding of a civil kind' [citation]; and it simply connotes an 'adversary proceeding' [citation], or 'a process in law instituted by one party to compel another to do him justice' [citation]. [¶] 'Lawsuit' is defined by Webster's Third New International Dictionary (p. 1280) as 'any of various technical legal proceedings.' [¶] And the term has expressly been held to embrace arbitration proceedings. ' "[S]uit" is a broad term including arbitration.' [Citations.]" (*Taranow* v. *Brokstein* (1982) 135 Cal.App.3d 662, 665-666 [185 Cal.Rptr. 532], italics omitted.)

The Michigan Supreme Court, addressing the same issue that the majority decides, concluded that "suit," as used in a CGL policy to trigger the insurer's duty to defend, does not unambiguously refer only to civil actions commenced in a court. The Michigan Supreme Court's decision includes these relevant observations:

"There is a division of opinion, both within Michigan and among other jurisdictions, regarding the definition of the term 'suit,' and its application to nontraditional legal proceedings. Some courts have found that 'suit' must refer unambiguously to a court proceeding initiated by a complaint, while others hold that the term may also encompass some nonjudicial proceedings.

"In determining what a typical layperson would understand a particular term to mean, it is customary to turn to dictionary definitions. Having canvassed a number of lay dictionaries, we note that most definitions of 'suit' do include a reference to some type of court proceeding, e.g., 'the act, the process, or an instance of suing in a court of law.' The Random House Dictionary of the English Language (1987). Nevertheless, 'suit' is not

defined exclusively in those terms. For instance, Webster's New World Dictionary of the American Language (2nd college ed., 1982), provides the alternative definition, 'attempt to recover a right or claim through legal action,' while Webster's Third New International Dictionary of the English Language (1964), defines suit as 'the attempt to gain an end by legal process: prosecution of a right before any tribunal.'

"The existence of these alternative and more general definitions of a 'suit' persuasively suggests that a typical layperson might reasonably expect the term to apply to legal proceedings other than a court action initiated by a complaint. [Citation.] Where the insurers fail to provide otherwise, that commonly understood meaning must prevail." (*Mich. Millers Mut. Ins.* v. *Bronson Plat.*, *supra,* 445 Mich. 558, 567-569 [519 N.W.2d 864, 869], fns. & italics omitted.)

Another focal point of the majority's decision is the proposition that a PRP notification letter is properly characterized as a "claim" rather than a "suit." The terms "claim" and "suit" both appear in the standard CGL policy, and are used in a way that indicates they are intended to be mutually exclusive. The majority reasons that because "suit" unambiguously refers to a court proceeding initiated by complaint, a PRP notification letter does not commence a "suit," and therefore it must be, by default, a "claim." (Maj. opn., *ante*, at pp. 879, 881-882.) I find this reasoning unpersuasive.

One could just as readily reach the opposite conclusion by beginning with the term "claim" rather than the term "suit." Focusing on the usual meaning of "claim" in the insurance context, one might conclude that "claim" is unambiguous and that it means a prelitigation demand letter that may be ignored without adverse legal consequences. A PRP notification letter does not satisfy this definition of "claim." As the majority acknowledges (maj. opn., *ante*, at p. 861), the letter at issue here was sent by an administrative agency, recited the agency's factual findings and legal conclusions, and ordered the insured to take specific actions. As the majority also acknowledges (maj. opn., *ante*, at p. 881), failure to respond to this sort of letter has substantial adverse legal consequences, including fines of up to $25,000 per day (Health & Saf. Code, § 25359.2) and lost opportunities to contest the scope and cost of the cleanup. It must follow, therefore, that a PRP notification letter is not a "claim" and that, by a process of elimination, it must be a "suit" (or, more precisely, the event that initiates a "suit").

Obviously, resolution of the duty-to-defend issue presented here should not turn on whether analysis begins with the term "suit" or with the term "claim." The correct inquiry, in my view, is which of the two terms—"suit" or "claim"—more aptly describes the PRP notification letter and the administrative process that the sending of the letter initiates. In my view (and that

of the various courts reaching decisions contrary to the majority's decision here), a PRP notification letter, which includes an administrative order backed by heavy sanctions, and the administrative remediation process that the letter initiates, in substance resemble a typical personal injury court proceeding initiated by complaint more closely than they do the typical personal injury claimant's prelitigation demand letter that an insured may ignore without legal consequences. In any event, the CGL policy language at issue here is ambiguous as to whether a PRP notification should be treated as a mere "claim" or as the initiation of a "suit," and under our rules of policy interpretation (see, e.g., *AIU Ins. Co.* v. *Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253]), this ambiguity should be resolved in favor of coverage.

Finally, the majority's decision is inconsistent with *AIU Ins. Co.* v. *Superior Court, supra,* 51 Cal.3d 807. There, this court held that when the government seeks to recover environmental pollution remediation costs in a civil suit, those costs are, in the words of the standard CGL policy, sums that the insured is "legally obligated" to pay as "damages." (*Id.* at p. 837.) It is inconsistent with generally accepted principles of insurance law to hold that even though the insurer must indemnify government remediation costs, it need not represent and defend the insured in the administrative process that largely determines the amount of these costs. In the same decision, this court also held that an insurer must indemnify the costs of complying with an injunction ordering remedial action. (*Id.* at p. 841.) It is illogical to hold that an insurer need not pay those costs when they result from compliance with an administrative order rather than from compliance with an injunction. As this court stated, "costs of compliance must be interpreted as 'damages' in the environmental context, because to hold otherwise would make insurance coverage hinge on the 'mere fortuity' of the way in which government agencies seek to enforce cleanup requirements, would unreasonably constrain the agencies' choice of cleanup mechanisms, and would introduce substantial inefficiency into the cleanup process." (*Id.* at pp. 840-841.) "Because an insured would reasonably expect equal coverage of the costs of equivalent or alternative remedies, the costs of injunctive relief under the statutes in question here are 'damages' for CGL purposes." (*Id.* at pp. 841-842.) So too here, a reasonable insured would expect the insurer to pay cleanup costs whether the insured's obligation for those costs is determined administratively or judicially, and a reasonable insured would also expect the insurer to represent and defend its interests in the forum—whether administrative or judicial—in which its cleanup costs were determined. An insured would not expect that the existence of coverage for defense costs would "hinge on the 'mere fortuity' of the way in which government agencies seek to enforce cleanup requirements." (*Id.* at p. 840.)

For these reasons, I would hold that a PRP notification triggers the insurer's duty to defend under the standard CGL policy language at issue here.

Mosk, J., and Werdegar, J., concurred.

Appellant's petition for a rehearing was denied September 23, 1998, and the opinion was modified to read as printed above. Mosk, J., Kennard, J., and Werdegar, J., were of the petition should be granted.